1  JOSEPH P. RUSSONIELLO (CSBN 44332)
   United States Attorney
2
   BRIAN J. STRETCH (CSBN 163973)
3  Chief, Criminal Division

4  ERIKA R. FRICK (CSBN 208150)
   JONATHAN D. SCHMIDT (CSBN 230646)
5  Assistant United States Attorneys

6    450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102
7    Telephone: (415) 436-6973
     Facsimile: (415) 436-7234
8    Email:  erika.frick@usdoj.gov

9  Attorneys for Plaintiff

10
                    UNITED STATES DISTRICT COURT
11
                  NORTHERN DISTRICT OF CALIFORNIA
12
                     SAN FRANCISCO DIVISION
13

14  UNITED STATES OF AMERICA,        )      No. CR 07-0380 SI
                                     )
15            Plaintiff,             )
                                     )      UNITED STATES' MOTIONS *IN LIMINE*
16       v.                          )
                                     )
17  NINA L. DONEHUE,                 )      Trial Date:  July 14, 2008
                                     )      Time:        8:30 a.m.
18            Defendant.             )      Court:       Hon. Susan Illston
    _____)

19

20                      **I.  INTRODUCTION**

21        The defendant, Nina L. Donehue, was charged by a federal grand jury on March

22  27, 2008, in a Second Superseding Indictment, with one count of violating 18 U.S.C.

23  § 666(a)(1)(A) by embezzling funds from a federally-funded government agency, i.e.,

24  Northridge Cooperative Homes, Inc. (hereinafter "Northridge").  The charge is based on

25  Donehue's taking and retention of Northridge operating account funds for her personal

26  benefit.

27                    **II.  STATEMENT OF FACTS**

28        Since 2003, the defendant, Nina L. Donehue, has been a resident of Northridge,

                                     1

1   which is a housing cooperative for low-income people that is funded by the U.S.

2   Department of Housing & Urban Development ("HUD") and that is located in the

3   Bayview area of San Francisco.  In or about 2004, Donehue was elected to the Northridge

4   Board of Directors and held a position of Secretary.  At the monthly Board meetings that

5   Donehue attended from 2004 through January 2006, a Monthly Report for Establishing

6   Net Income was circulated to the Board members.  The monthly reports included detailed

7   financial information about Northridge's operating accounts.  Among other things, the

8   monthly reports revealed that Northridge had an operating account at Wells Fargo and

9   indicated the full account number (ending in 3488).

10      Because of her elected position, Donehue, like several other management and

11  Board members, was entrusted with signatory authority over the Northridge's operating

12  account at the Wells Fargo Bank.  As Donehue well knew, the Northridge had an

13  established procedure for paying bills that required each check written from the

14  Northridge account to be supported by receipts or other documentation and signed by

15  three different authorized officials.  None of the Northridge officers or Board members

16  was authorized to have or did have a credit card or debit card from the Northridge bank

17  account, and none of the officers or Board members was authorized to spend Northridge

18  funds for personal use.

19      On or about December 19, 2005, Donehue opened an individual checking account

20  with the Wells Fargo Bank, Bayview Office, in San Francisco.  The Wells Fargo

21  employee who assisted Donehue was Sylvia Choy.  Choy authorized the issuance of two

22  sets of bank cards for Donehue during that transaction:  one from Donehue's individual

23  account and one from a Northridge business operating account.

24      On January 20, 2006, Donehue apparently checked to see how much money was in

25  the Northridge account, because there is a charge on the Northridge banking statement of

26  $1.00 for an "ATM Statement Fee."  Thereafter, from January 20 to February 6, 2006,

27  Donehue proceeded to incur a series of unauthorized ATM cash withdrawals and debits

28  on the Northridge account.  Donehue made a total of 17 ATM withdrawals during the 17-

day period between January 20 and February 6, 2006: one each day on January 20, 21, 22, 23, and 24, 2006, two on January 25, 2006, one each day on January 26, 27, 28, 30, and 31, 2006, and one each day on February 2, 3, 4, 5, and 6, 2006. Most of those ATM withdrawals were for $200 or $300 at a time. At the time Donehue received the funds, the ATM machines would almost certainly have informed her of the source of the funds (a checking account rather than a line of credit), the account number (Northridge's account number), and the balance in the account (which ranged from approximately $76,000 to nearly $320,000 during this time period. For example, Donehue incurred another "ATM Statement Fee" for a withdrawal on February 4, 2006, and the balance showing in the account on that date was approximately $320,000. Donehue also made a total of approximately six purchases at various merchants from January 24, 2006 (Red Lobster) through February 3, 2006 (Western Christian).

During this time period, Donehue also obtained two cashiers checks from the Northridge account, one for $20,000 on or about January 25, 2006, and one for $10,000 on or about January 27, 2006, and she used those cashiers checks to purchase a new 2006 Chrysler 300M automobile from Barber Dealer Group ("Barber") in Vallejo, California. In the course of purchasing that automobile at Barber, Donehue filled out and signed a Credit Application. On that application, Donehue indicated that her total monthly income was $2523 (which amounts to approximately $30,000 annually). She also indicated that she had *two* bank accounts at Wells Fargo: one with a balance of $100 (listed with the account number of her personal Wells Fargo account) and a second *checking* account with a balance of $53,858 (listed with the last four digits of the Wells Fargo Northridge operating account, *i.e.*, 3488).

The total amount of unauthorized purchases by Donehue during the 17-day period from January 20 to February 6, 2006 was approximately $35,000.

On or about February 6, 2006, Northridge discovered through a review of its bank statements that the unauthorized purchases had occurred. Northridge Administrator Dwenda ("Penny") Hall went to Wells Fargo Bank and inquired about the disbursements.

1  Hall learned that Donehue had received a bank card and that she was misappropriating

2  Northridge funds.  After immediately canceling Donehue's access to the Northridge

3  account, Northridge (through Hall) filed a police report with the San Francisco Police

4  Department.

5      On or about February 8, 2006, at a special called emergency Board meeting, the

6  Board members confronted Donehue about the transactions.  Donehue claimed that the

7  bank had given her "credit" and that she thought she would pay it back.  She indicated

8  that she thought the bank had issued the card to her personally and that she was not aware

9  that the funds were actually coming from Northridge's account.  After the meeting,

10 several participants from the Board meeting went to Donehue's residence to request that

11 she return the automobile to Northridge.  Donehue did not return the car at that time.  As

12 of the date of this filing, Donehue has not returned the car or any of the other property to

13 Northridge and continues to use the automobile for her personal benefit.

14     The morning after the special called Board meeting, on February 9, 2006, Donehue

15 returned to Wells Fargo and told Sylvia Choy that she and the other signers on the

16 Northridge account were all partners at the cooperative and that Donehue thought she

17 could use the money.  Donehue also stated that she went out and bought a new car with

18 the money.

19     On or about October 16, 2006, Donehue was interviewed by HUD Special Agent

20 James Luu.  Donehue told Luu that the whole incident involving her misuse of

21 Northridge's fund was due to a mistake by Wells Fargo employees.  Donehue stated that

22 instead of getting a credit card that she thought she had applied for, she was given a

23 business check card to the Northridge account.  Donehue stated that she unknowingly

24 used this Platinum business check card to make purchases, thinking that it was a credit

25 card.  Donehue admitted to Agent Luu that the maximum credit limit she had on any

26 credit card in the past was $500, and that her annual income was less than $20,000.

27

28

### III.  MOTIONS IN LIMINE

The government hereby makes the following motions in limine:

**A.    The Government Plans to Introduce the Audiotape of the February 8, 2006 Special Called Board Meeting and A Transcript of that Meeting.**

On February 8, 2006, the Northridge Board of Directors held a special called Board meeting in order to confront Donehue about the monies that she had spent from the Northridge operating account.  That meeting was recorded on audiotape.  Donehue and the government have stipulated in a document to be filed separately with this Court that the audiotape is admissible as a business record.  Donehue's statements are also admissible, when elicited by the government, as admissions of a party-opponent, and the statements of others present at the meeting should also be admitted not for the truth of the matters asserted but to give context to Donehue's statements.

The government plans to play that audiotape for the jury and provide a transcript of that meeting for the jury to follow along with as a listening aid.  Donehue has indicated that she has no objection to the transcript being used for that purpose.

**B.    The Government Plans to Introduce Evidence of Donehue's Income and Credit History Because It Is Probative of Her Intent, Knowledge, and Absence of Mistake.**

Donehue earned approximately $20,000 to $30,000 per year at the time of the alleged offense.  Yet, during a 17-day period in January and February 2006, Donehue spent nearly $35,000 out of Northridge's operating account, including $30,000 on a brand new car.  When confronted at the special called Board meeting on February 8, 2006, Donehue claimed that she thought the bank card issued to her by Wells Fargo was issued to her personally and was a credit card and that she intended to pay back the monies she had spent.  Therefore, the fact that Donehue made less money in a year than she spent in less than three weeks on a purportedly personal line of credit is clearly relevant to show Donehue's knowledge that the funds were coming from the Northridge account rather than from her own credit card.

The government plans to introduce the following business records to establish

1   Donehue's income:  defendant's Wells Fargo banking records for her personal account,

2   which show much lower spending patterns than her spending patterns on the Northridge

3   account; Donehue's Section 8 housing application and the credit report that constitutes

4   part of that application, which were submitted to secure her place at Northridge; and the

5   Credit Application submitted by Donehue to Barber Dealer Group indicating her income

6   (all of which are admissible as business records).  The government will also introduce

7   testimony from Northridge Administrator Penny Hall regarding Donehue's Section 8

8   housing application and financial status and from Agent Luu testimony regarding

9   Donehue's admission that she earned less than $20,000 per year.

10      Donehue's credit history is similarly relevant.  Donehue admitted during her

11  interview with Agent Luu that the highest credit limit she had previously had on a credit

12  card was $500.  Therefore, her credit history is relevant to show her intent, knowledge,

13  and absence of mistake because it is totally implausible that a bank would issue a credit

14  card with such a high credit limit to someone who had previously had such a low credit

15  limit.  The government plans to introduce this evidence through the testimony of Agent

16  Luu and through introduction of the credit report that constitutes part of Donehue's

17  Section 8 housing application.

18  **C.    The Northridge Board of Directors Resolution Dated October 12, 2004 and
        Testimony Explaining that Document Should Be Admitted as Evidence of**
19      **Donehue's Knowledge, Motive, Intent, and Absence of Mistake or Accident.**

20      The government intends to introduce a resolution dated October 12, 2004 that was

21  signed by Donehue as Secretary of the Board of Directors of Northridge.  In the

22  document, the Board resolves to have several Northridge residents repay Northridge

23  operating account funds that they had improperly used out of their equity when they move

24  out of Northridge.  The government also plans to elicit testimony from Northridge

25  Administrator Penny Hall explaining the incident leading to the resolution.

26      The government does not intend to offer this evidence for the truth of the matter

27  asserted.  Instead, the government intends to offer this evidence to demonstrate

28  Donehue's state of mind and absence of mistake at the time the alleged offense in this

1  case occurred.  This evidence is relevant to proving Donehue's fraudulent intent when she

2  took and retained monies belonging to Northridge.  It demonstrates that Donehue had

3  experience that led her to believe that if she were caught taking monies from Northridge,

4  at worst she would only be required to repay those monies out of her equity at some

5  undetermined future time if she ever decided to move out of the Northridge cooperative.

6  Because these statements are not being introduced for a hearsay purpose, they should not

7  be excluded under Federal Rules of Evidence 801 and 802.

8  **D.    The Government Plans to Introduce Evidence Showing that the Platinum
       Business Check Card Used by Donehue Had Northridge's Name Clearly
9      Printed on the Front of the Card.**

10      On February 8, 2006, during and after the special called Board meeting at which

11 Donehue was confronted by other Board members, Donehue was asked to return the bank

12 card that she had used to misappropriate Northridge funds.  Donehue refused to return

13 that card, so the government does not have the actual card to use in evidence.  However,

14 Sylvia Choy, the bank teller who assisted Donehue in obtaining the card, and/or another

15 Wells Fargo employee will testify that – in the normal course of Wells Fargo business

16 practices – the card would have had both Donehue's name and Northridge's name on the

17 face of it.  This constitutes important evidence of Donehue's intent at the time she used

18 the card.

19 **E.    The Government Plans to Introduce Evidence Showing that the ATM
       Withdrawal Process and Cashiers Check Withdrawal Slips Put Donehue On
20     Notice That She Was Using Funds From A Checking Account Rather Than A
       Credit Card or Line of Credit.**

21

22      Donehue asserts that she believed she was spending money from a personal credit

23 card rather than from the Northridge operating account.  The government plans to

24 introduce testimony from Sylvia Choy, the bank teller who assisted Donehue, or from

25 another Wells Fargo employee, demonstrating that Donehue was put on notice during the

26 process of using the Northridge bank card that the funds were coming from a checking

27 account rather than a credit card or line of credit, as Donehue claims she believed.  The

28 Wells Fargo employee will testify that, in the course of withdrawing money from an ATM

machine and obtaining "ATM statements" such as those that Donehue obtained on January 20, 2006 and February 4, 2006, an individual would see the source of the funds was a checking account and would see the balance in the account. In addition, the government plans to introduce the withdrawal slips that Donehue signed for the cashiers checks. Those withdrawal slips clearly show that the funds were coming from a checking account. The defendant has agreed to stipulate that the cashiers check withdrawal slips are admissible as business records.

**F.    The Government Should Be Permitted to Introduce Evidence that Donehue Still Retains the Chrysler 300M Automobile.**

The government plans to introduce evidence that Donehue kept the Chrysler 300M automobile that she purchased with Northridge funds, despite the fact that Northridge Board members asked her to return it, and that she still retains the automobile now. This evidence is admissible for at least two reasons. First, the fact that Donehue did not return the automobile after being told at the February 8, 2006 Board meeting that she had purchased it with Northridge funds clearly establishes that– no later than shortly after the Board meeting if not well before that – Donehue had formed the requisite criminal intent to deprive Northridge of its property. Second, the fact that Donehue never returned the car is also probative of Donehue's intent and knowledge during the entire time period that she was misusing Northridge funds. Donehue is taking the position that – until the February 8, 2006 Board meeting – she believed she was using a credit card. However, a reasonable juror could conclude that a person who initially had innocent intent and then discovered that the monies she was using did not belong to her would make at least some effort to return the property to the rightful owner. The fact that Donehue did not return the property upon "learning" that the funds were not her own can be considered by the jury as evidence tending to show that Donehue was acting in bad faith all along.

**G.    The Government Seeks Clarification of This Court's Order Denying Defendant's Motion to Dismiss the Second Superseding Indictment.**

In its Order Denying Defendant's Motion to Dismiss the Second Superseding

1    Indictment, this Court held that Section 666 is not a continuing offense for statute of

2    limitations purposes, and the government does not take issue with that ruling here.  This

3    Court further "agree[d] with the government that if it cannot demonstrate that defendant

4    violated § 666 when she received the funds, it may be able to demonstrate that defendant

5    violated § 666 when she decided to retain the funds after learning that they were not hers

6    and that Northridge wanted them back."  Order, at 4.  This Court went on to state:

7                    The Court therefore construes the second superseding
                     indictment as alleging that defendant committed a crime
8                    under § 666 between January 20, 2006 and February 6, 2006,
                     under its first theory, or that defendant committed a crime
9                    under § 666 on or about February 8, 2006, when defendant
                     was notified that the funds belonged to Northridge.  In order
10                   to convict defendant, a jury must agree unanimously on which
                     facts and which of the government's two theories apply.  Such
11                   unanimity will avoid the duplicity problems raised by the
                     defendant.

12

13   Order, at 4-5.

14          The government regrets that it was not more pellucid at the hearing on that motion

15   and respectfully seeks clarification of the Court's ruling in light of the further factual

16   background provided in this filing.  Specifically, the government believes it will be

17   misleading to the jury to divide the offense into two separate dates ranges as the Court has

18   suggested.  In order to convict the defendant, the jury must find – in essence – that

19   Donehue took and/or retained funds belonging to Northridge, and that at some point

20   during the time when she took and retained those funds, she formed a criminal intent.

21   Donehue's *actus reus*, that is, her taking and retention of funds, was continuous from

22   January 20, 2006 when she began withdrawing funds from the operating account until

23   February 8, 2006 and shortly thereafter, when she kept the Chrysler 300M automobile

24   despite being unequivocally informed at the Board meeting that the funds with which she

25   purchased it did not belong to her.  It is for the jury to decide if and when Donehue

26   formed the *mens rea* to defraud Northridge.  The jury may well find that Donehue had

27   criminal intent from the very beginning, when Choy opened the Northridge bank card for

28   Donehue.  Or the jury could conclude that Donehue figured out that the funds did not

1  belong to her at any of various points along the way, *e.g.*, (1) when Donehue repeatedly
2  over the course of several weeks went to the ATM machine and saw a checking account
3  balance as high as $320,000; (2) on or about January 25, 26, or 27, when Donehue signed
4  cashiers check withdrawal slips indicating that the funds were coming from a checking
5  account rather than a credit card or line of credit; (3) when she filled out and signed the
6  Barber Dealer Group Credit Application on or about January 26, 2006 indicating that her
7  assets included a second "checking account" with a balance of over $50,000; or (4) when
8  she was confronted by the Board on February 8, 2006 and thereafter refused to return the
9  car to Northridge.  The *actus reus* continued as long as Donehue was taking or retaining
10 funds, so it is for the jury to decide exactly when the *mens rea* was formed and a crime
11 was therefore committed.

12         Moreover, the jury could and should convict the defendant even if different jurors
13 reach different conclusions about when, precisely, Donehue had the requisite criminal
14 intent.  Under clearly established Ninth Circuit and Supreme Court precedent, there is no
15 unanimity requirement in this regard.  Under Federal Rule of Criminal Procedure 7(c)(1),
16 "a jury may convict on a finding of any of the elements of a disjunctively defined offense,
17 despite the grand jury's choice of conjunctive language in the indictment."  *United States*
18 *v. Bettencourt*, 614 F.2d 214, 219 (9th Cir. 1980).  The Supreme Court has held that jurors
19 are not constitutionally required to unanimously agree on alternative theories of criminal
20 liability.  *Schad v. Arizona*, 501 U.S. 624, 629 (1991) (no unanimity requirement for
21 alternative theories of premeditated and felony murder).  Rather, "'***different jurors may***
22 ***be persuaded by different pieces of evidence, even when they agree upon the bottom***
23 ***line.***  Plainly there is no requirement that the jury reach agreement on the preliminary
24 factual issues which underlie the verdict.'"  *Id.* (emphasis added) (quoting *McCoy v. North*
25 *Carolina*, 494 U.S. 433, 449 (1990) (Blackmun, J., concurring)).  The Ninth Circuit, too,
26 has flatly rejected the idea that jurors must be unanimous about how the crime was
27 committed, even in cases where the acts that were alleged in the conjunctive would
28 require a finding of substantially different fact patterns by the jury in order to convict.

1   *See, e.g.*, *United States v. Abascal*, 564 F.2d 821, 832 (9th Cir. 1977) (holding, in the

2   context of an indictment alleging that defendants conspired to "import, distribute, and

3   possess with intent to distribute" drugs, that "[t]he government may charge in the

4   conjunctive form that which the statutes denounce disjunctively, and evidence supporting

5   any one of the charges will support a guilty verdict").  Indeed, the Ninth Circuit has

6   specifically held there was no duplicity problem in a case involving a conjunctive

7   indictment under Section 641, which is an analog to Section 666.  *See McGriff v. United*

8   *States*, 408 F.2d 333, 334 (9th Cir. 1969) (indictment charging that defendant did "receive,

9   conceal and retain" stolen goods and property in violation of 18 U.S.C. § 641 was not

10  duplicitous because "'[i]t is ... proper to charge conjunctively the elements of a crime

11  which is denounced disjunctively in the statute, and a finding of any one of the said

12  elements will support a verdict of guilt.'").[1]

13       Those cases are exactly on point here.  "It is important to distinguish ... a statute

14  creating several offenses from one ... which enumerates several ways of committing the

15  same offense."  *Gerberding v. United States*, 471 F.2d 55, 59 (8th Cir. 1973) (rejecting

16  duplicity challenge where indictment alleged that defendant assaulted *and* put in jeopardy

17  the lives of two persons).  Section 666(a)(1)(A) enumerates five different ways –

18  embezzle, steal, obtain by fraud, convert, or intentionally misapply – of committing the

19  same offense.  Far from being mutually exclusive, those five ways of committing the

20  crime overlap in significant ways.  For example, embezzlement includes the "'the

21  deliberate taking *or* retaining'" of another's property.  *United States v. Smith*, 373 F.3d

22  561, 564 (4th Cir. 2004).  Similarly, conversion also includes "the deliberate taking *or*

23  retaining of the money or property of another."  Eighth Circuit Model Criminal Jury

24  Instructions, Final Instructions: Elements of Offenses, § 6.18.666A, page 190.  Because

25  the five verbs in Section 666 all fundamentally define a single offense that can be

26  _____

27       [1] *United States v. Aguilar*, 756 F.2d 1418 (9th Cir. 1985), is inapposite because,
    unlike with 18 U.S.C. § 666 (or, by analogy, 18 U.S.C. § 641), the fact that 18 U.S.C.

28  § 912 "states two offenses is well established."  756 F.2d at 1420 n.1.

1    committed in several ways, unanimity is not required.  Thus, for example, even if six

2    jurors believed she had criminal intent from the first meeting with Choy and six jurors

3    believed she did not have it until the February 8, 2006 Board meeting, Donehue should

4    still be convicted under this clearly established law.  The jury should convict if the

5    defendant did in fact take and/or retain at least $5000 of Northridge's property and knew,

6    either at the time of the taking of the property or at the time of her decision to retain that

7    property or both, that the property belonged to Northridge.

8         The government respectfully submits that bifurcating the date range or, in the

9    alternative, superseding the indictment to allege two counts, will only mislead the jury

10   and create problems and possibly even a miscarriage of justice.  It is true as the Court

11   held that Donehue can be convicted whether she had the requisite criminal intent when

12   she took the property or after she already had the property in her possession.  However,

13   the applicability of those two "theories" cannot be neatly divided into two date ranges or

14   two separate counts.  For example, if – hypothetically – the jury decided that proof

15   beyond a reasonable doubt of criminal intent were established by Donehue's statements

16   on the Barber Credit Application on January 26, 2006, Donehue had already taken a large

17   amount of property, and she thereafter retained that property while continuing to take

18   more property with criminal intent.  Thus, the "retention" theory cannot be limited to "on

19   or about February 8, 2006."  Nor does expanding the date range of the "retention" theory

20   fully solve the conundrum here.  If the jury is instructed that it must unanimously choose

21   between property being unlawfully "taken" from January 20 to February 6, 2008 versus

22   unlawfully "retained" from January 20 to February 8, 2008 or shortly thereafter, six jurors

23   might choose one theory and six the other, resulting in a hung jury despite the fact that the

24   defendant clearly committed the offense.  Conversely, if the indictment were superseded

25   to charge two counts with those dates ranges, other problems arise.  Because the verbs in

26   Section 666 are not mutually exclusive, there is no logical way to divide up the verbs into

27   two counts.  And even if all five verbs are included in each count, with an instruction that

28   one count covers "taking" and one count covers "retaining," the jury could easily convict

1   Donehue of both counts, thus resulting in a multiplicity problem, or could disagree about
2   which had been proved, thus resulting again in a hung jury.

3         Rather than bifurcating the date range, superseding the indictment, or even giving
4   a unanimity instruction, the most appropriate way to address this issue is simply to give a
5   standard jury instruction as the Court would in any case involving an indictment that
6   contains multiple verbs defining the offense.  For example, in bank robbery cases, where
7   the crime can be committed by force, violence, or intimidation, courts routinely give a
8   standard jury instruction without requiring unanimity about whether the crime was
9   committed by force, violence, or intimidation.  The same course should be followed here.

10        The government emphasizes that its position in no way contradicts this Court's
11  ruling that Section 666 does not create a continuing offense.  The crime here was not
12  completed until Donehue formed the requisite *mens rea*.  Prior to her realization that the
13  funds did not belong to her, the *actus reus* may have already been established, but it was
14  not yet a crime.  Once it became a crime, the government submits that the entire course of
15  conduct from January 20 through February 8, 2006 or shortly thereafter constituted one
16  crime of taking and/or retaining property with criminal intent, and that it does not matter
17  if part of the conduct was taking with criminal intent and part of the conduct was
18  retaining with criminal intent (depending on which date the intent was formed).  This is
19  exactly the sort of case that the precedents cited above from the Ninth Circuit and the
20  Supreme Court (*Bettencourt*, *Schad*, and *McGriff*) were meant to address.  It is for the
21  jury to decide if a crime was committed here, and the jury should convict even if the
22  individual jurors disagree on exactly when the criminal intent was formed.

**H.    The Government Should Be Permitted to Elicit the Defendant's Out-of-Court
        Statements But the Defendant Should Be Precluded From Doing So.**

**1.    Donehue's Out-of-Court Statements**

26        During the course of the facts underlying this case, Donehue made certain oral
27  statements to various witnesses.  The government is aware of at least four sets of
28  statements that were made by Donehue, and there may well be other statements that

Donehue made to other individuals of which the government is not aware at this time. The oral statements of which the government is aware are as follows:

- At the February 8, 2006 special called Board meeting, Donehue made several statements, including that "No, I don't have Northridge money.  I was assuming that the bank was giving me credit, and I took the credit."

- After the February 8, 2006 Board meeting, when several Board members went to Donehue's house to seek return of the automobile, Donehue stated she had consulted with her attorney and that her attorney had advised her not to hand over the car or the bank card.

- On or about February 9, 2006, Donehue returned to Wells Fargo and told Sylvia Choy that she and the other signers on the Northridge account were all partners at the cooperative and that Donehue thought she could use the money.  Donehue also stated that she went out and bought a new car with the money.

- On or about October 16, 2006, Donehue told Special Agent James Luu that the whole incident involving her misuse of Northridge's fund was due to a mistake by Wells Fargo employees.  Donehue indicated that instead of getting a credit card that she thought she had applied for, she was given a business check card to the Northridge account.  She stated that she unknowingly used this Platinum business check card to make purchases, thinking that it was a credit card.  Donehue also admitted to Agent Luu that the maximum credit limit she had on any credit card in the past was $500, and that her annual income was less than $20,000.

**2.    The Government Should Be Permitted to Elicit Donehue's Admissions, But the Statements Are Inadmissible Hearsay to the Extent that Defendant Seeks Admission.**

To the extent that the government elicits such statements from government or lay witnesses, these statements are admissions of a party-opponent and therefore not hearsay. Fed. R. Evidence. 801(d)(2)(A).  However, to the extent that Donehue seeks admission of

her statements, they constitute inadmissible hearsay. This is true even if Donehue's statements may be exculpatory, and even if such exculpatory statements were not elicited in direct examination of the government's witnesses. *See, e.g., United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) (holding that "the district court did not abuse its discretion when it limited Ortega's ability to elicit his exculpatory hearsay statements on cross-examination" because otherwise "Ortega would have been able to place his exculpatory statements before the jury without subjecting himself to cross-examination, precisely what the hearsay rule forbids") (internal quotation and editing marks omitted).

Even if Donehue testifies and is cross-examined concerning the truthfulness of her testimony, the statements she made to agents or other witnesses are not admissible as "prior consistent statements." For a statement to be deemed "not hearsay" under Federal Rule of Evidence 801(d)(1)(B), the statement must be "offered to rebut an express or implied charge against the declarant of *recent fabrication or improper influence or motive*" (emphasis added). For any "prior consistent statements" to qualify as non-hearsay under this rule, the Supreme Court has held that the statement must have been made *before* the alleged fabrication, influence, or motive came into being. *See Tome v. United States*, 513 U.S. 150, 167 (1995); *see also United States v. Collicott*, 92 F.3d 973, 979 (9th Cir. 1996) (in order to be admitted, "the prior consistent statement must be made *prior* to the time that the supposed motive to falsify arose") (emphasis added). Prior consistent statements by a witness "may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited." *Tome,* 513 U.S. at 157. Accordingly, "the prior consistent statements *must* rebut the charge of improper motive, not merely bolster the veracity of the story told." *Collicott,* 92 F.3d at 979 (emphasis added) (internal quotation and editing marks omitted). Here, Donehue's motive to avoid criminal exposure arose contemporaneously with her initial conduct in this case, which was to open a bank card with Wells Fargo on the Northridge account in December 2005. Accordingly, Donehue should be precluded from recounting what she told authorities or other witnesses regarding the subject matter of this prosecution, even if

1   she testifies and is subjected to cross-examination.

2          Finally, to the extent that government witnesses testify about some, but not all, of

3   the oral statements uttered by Donehue during the course of the alleged offense, the

4   defense may not elicit other statements under the guise of the "rule of completeness."

5   This rule applies only to written or recorded statements, *see* Fed. R. Evidence. 106, and so

6   is inapplicable to the defendant's oral statements.  Moreover, it is inappropriate to use the

7   rule of completeness as a shoehorn for admitting hearsay or otherwise inadmissible

8   evidence.  *See United States v. Collicott,* 92 F.3d 973, 983 (9th Cir. 1996) ("Rule 106

9   does not render admissible the evidence which otherwise is inadmissible under hearsay

10  rules.") (internal quotation marks omitted).

11         Accordingly, the government hereby moves in limine for an order precluding the

12  defense from eliciting any statements made by Donehue:  (1) from any government

13  witnesses who testify at trial; (2) from Donehue herself should she elect to testify; or

14  (3) from any third party witnesses the defense may seek to call at trial.

15  **I.    Donehue Should Be Precluded From Raising Any Advice of Counsel Defense
16          or Eliciting Testimony from Any Witness Regarding Donehue's Purported
        Reliance on Advice of Counsel.**

17         Following the February 8, 2006 Board meeting, Donehue told Board members that

18  her attorney had advised her not to return the car that she had purchased with Northridge

19  funds to Northridge.  To date, Donehue has never returned the car to Northridge.  At the

20  hearing before this Court on April 25, 2008, regarding Donehue's motion to dismiss the

21  Second Superseding Indictment, defense counsel represented to this Court that Donehue

22  would not be raising an advice of counsel defense at trial.  The government therefore

23  moves in limine to preclude Donehue from doing so and to preclude any witness,

24  including Donehue herself should she testify, from referring to the statement that

25  Donehue made on February 8, 2006 or any other such statement about relying on an

26  attorney's advice.

27

28

UNITED STATES' MOTIONS IN LIMINE
CR 07-0380 SI                    16

1  **J.    Donehue Should Be Precluded from Referring to Any Witness' Criminal
2         Convictions.**

3         **1.    Background**

4         Several of the prospective witnesses in this case have been convicted of crimes.
5  Specifically:

6         <u>Sylvia Choy</u> - The Wells Fargo teller who issued Donehue a bank card on the
7  Northridge operating account has one 2005 misdemeanor conviction for driving under the
8  influence ("DUI").

9         <u>Kevin Barr</u> - A Northridge Board member who served on the Board with Donehue
10 has a 1990 misdemeanor conviction for petty theft and a 1991 misdemeanor conviction
11 for petty theft.  He also has several arrests from 1986 to 1990.

12        <u>James Monroe</u> - A Northridge Board member who served on the Board with
13 Donehue has some undetermined criminal history and a misdemeanor conviction, but the
14 most recent activity was in 1970.

15        <u>Willie Poole</u> - A Northridge Board member who served on the Board with
16 Donehue has a 1981 arrest for DUI.

17        <u>Ethel Smothers</u> - A Northridge Board member who served on the Board with
18 Donehue has 1977 convictions for assault with a deadly weapon and carrying a concealed
19 weapon.  She also has a 1977 arrest for assault with a deadly weapon.

20        <u>Ezra Turner</u> - One of the (now-former) Barber Dealer Group employees who
21 assisted Donehue in the purchase of the Chrysler 300M automobile has a 1977 arrest for
22 DUI.

23        **2.    Reference to Criminal History More than 10 Years Old Should Be
24             Excluded.**

25        All of the criminal history for Barr, Monroe, Poole, Smothers, and Turner should
26 be excluded because it is more than 10 years old.  Fed. R. Evidence. 609(b).  Congress
27 intended that this type of evidence should be admitted "'very rarely and only in
28 exceptional circumstances.'"  *Zinman v. Black & Decker (U.S.), Inc.*, 983 F.2d 431 (2d

Cir. 1993), *quoting* S.Rep. No. 1277, 93d Cong., 2d Sess., *reprinted in* 1974

U.S.C.C.A.N. (93 Stat.) 7051, 7062; *see also United States v. Sims*, 588 F.2d 1145, 1147

(6th Cir. 1978) (noting that legislative history "evidences a basic distrust in the probative

value of convictions more than ten years old when evidence of such convictions is used to

impeach the credibility of a witness").

The probative value of such ancient convictions (the most recent 17 years ago, in

1991) does not outweigh its prejudicial effect.  All of the Board members have been

thoroughly rehabilitated and have no recent law enforcement contacts.  *See Sims*, 588

F.2d at 1148 ("[W]hen stale convictions are offered for the purpose of impeaching a

witness, they often shed little light on the present tendency of the witness toward

truthfulness and veracity.").  In addition, none of those convictions has any bearing on the

witnesses' credibility.  *See id*. at 1150 ("Rule 609(b) creates, in effect, a rebuttable

presumption that convictions over ten years old are more prejudicial than helpful and

should be excluded.").  This reasoning applies with even greater force to the arrests at

issue, which not only are ancient but also did not result in convictions.

**3.    Reference to Misdemeanor Convictions Should be Excluded.**

All of the misdemeanor convictions, including Choy's, should also be excluded

under Federal Rule of Evidence 609(a)(1) and (2).

**4.    Reference to Convictions that Are Irrelevant to Veracity Should be Excluded.**

Finally, the convictions noted above are not in any event probative of dishonesty

and any reference to them should therefore be excluded on that basis as well.

**K.    The Defense Should Be Precluded from Any References to Potential Punishment.**

The government moves to preclude, as irrelevant and prejudicial, any reference by

the defense to defendant's potential sentence during all phases of the trial (including jury

selection, opening statements, examination of witnesses, including Donehue if she elects

to testify, and summation).  Once the jury hears anything about punishment, the "bell"

1   simply cannot be un-rung or the damage neutralized by a curative instruction.  "It has

2   long been the law that it is inappropriate for a jury to consider or be informed of the

3   consequences of their verdict."  *United States v. Frank*, 956 F.2d 872, 879 (9th Cir.

4   1992).

5   **L.    Defendant Must Comply with Reciprocal Discovery Requirements.**

6        The government moves for an order (1) precluding defendant from introducing

7   evidence that should have been produced under the reciprocal discovery obligations of

8   Federal Rule of Criminal Procedure 16(b); and (2) pursuant to Rule 26.2 [reverse *Jencks*],

9   requiring production of prior statements of defense witnesses (other than the defendant)

10  that relate to the subject matter concerning which the defense witnesses will testify.

11       **1.    Reciprocal Disclosure under Rule 16**

12       Defendant has disclosure requirements under Rule 16(b), which include (A)

13  information pertaining to "books, papers, documents, photographs or tangible objects that

14  the defendant intends to introduce as evidence in his case-in-chief at trial"; (B) Reports of

15  Examinations and Tests; and (C) and "a written summary of any testimony that the

16  defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence"

17  pertaining to expert witnesses.

18       The government  has complied with its disclosure obligations and has requested

19  reciprocal discovery.  Donehue, however, has not responded.  The government therefore

20  moves for an order precluding defendant from introducing evidence that should have

21  been produced under the reciprocal discovery obligations of Rule 16(b).

22       **2.    Reciprocal Disclosure under Rule 26.2**

23       Rule 26.2(a) of the Federal Rules of Criminal Procedure provides:

24           After a witness other than the defendant has testified on direct
             examination, the court, on motion of a party who did not call
25           the witness, shall order the attorney for the government or the
             defendant and the defendant's attorney, as the case may be, to
26           produce, for the examination and use of the moving party, any
             statement of the witness that is in their possession and that
27           relates to the subject matter concerning which the witness has
             testified.

28

1    The statute embodying the rule was enacted, among other things, "to place in the

2   criminal rules the substance of ... 18 U.S.C. § 3500 (the Jencks Act)." Notes of the

3   Advisory Committee on Rules, S. 1437, 95th Cong. 1st Sess. (1977). In *United States v.*

4   *Scotti*, 47 F.3d 1237, 1249 (2d Cir. 1995), the Second Circuit stated of Rule 26.2:

5           The procedural requirements for making a motion for
            production and the definition of "statements" essentially track
6           those of the Jencks Act. *Compare* 18 U.S.C. § 3500(b) with
            Fed.R.Crim.P. 26.2.(a)-(b); *compare* 18 U.S.C. § 3500(e) with
7           Fed.R.Crim.P. 26.2(f). Fed.R.Crim.P. 26.2(f) Advisory
            Committee's Note, 1979 Addition (stating that Rule 26.2
8           places in the criminal rules the substance of 18 U.S.C. § 3500
            while also providing for production of statements of defense
9           witnesses).

10  *See also United States v. Aigbevbolle*, 827 F.2d 664, 667 n. 3 (10th Cir. 1987) ("The

11  Jencks Act provides for discovery of statements of prosecution witnesses after direct

12  examination of the witnesses at trial. If a statement cannot be produced under § 3500, it

13  cannot be produced at all. Rule 26.2 places in the criminal rules the substance of § 3500

14  and establishes procedures for production of defense witness statements. *See* Notes of

15  Advisory Committee on Rules.").

16         Pursuant to Rule 26.2(a), neither the government nor the defendant are required to

17  produce witness statements until after their testimony on direct examination. However,

18  the government has voluntarily disclosed, in the spirit of cooperative discovery, the

19  recorded statements of its witnesses. Because of the reciprocal nature of Rule 26.2, and

20  in the interest of expediting trial proceedings, defendant should be required to produce his

21  witnesses' statements. If defendant declines to produce his witnesses' statements until

22  after direct examination, the trial will be unnecessarily delayed because the government

23  will need time to review those statements prior to cross-examination.

24         Federal courts have "the responsibility to supervise the administration of criminal

25  justice in order to ensure fundamental fairness." *United States v. Richter*, 488 F.2d 170,

26  173 (9th Cir. 1973) (internal quotation marks omitted); *see also id.* at 173 (a district court

27  has "wide latitude" to "carry out successfully its mandate to effectuate, as far as possible,

28  the speedy and orderly administration of justice"). The government requests that the

1  Court use its power to effectuate the orderly administration of justice to order pre-trial

2  production of defense witness statements.

3  **M.    Forfeiture Proceedings**

4       The Second Superseding Indictment contains a forfeiture allegation seeking

5  forfeiture of the nearly $35,000 that Donehue took from Northridge and of the Chrysler

6  300M automobile that Donehue still has possession of at this time. *See* Fed. R. Crim. P.

7  7(c)(2) & 32.2(a). Rule 32.2 provides that as soon as practicable after a verdict of guilty

8  on any count for which forfeiture is sought, the court must determine what property is

9  subject to forfeiture under the applicable statute. If the government seeks forfeiture of

10 specific property, the court must determine whether the government has established the

11 requisite nexus between the property and the offense. If the government seeks a personal

12 money judgment, the court must determine the amount of money that Donehue will be

13 ordered to pay. In either case, the government's burden is by a preponderance of the

14 evidence. *See United States v. Garcia-Guizar*, 160 F.3d 511, 518 (9th Cir. 1998)

15 (preponderance standard is constitutional because criminal forfeiture is not a separate

16 offense, but only an additional penalty). This burden is unaffected by *Blakely v.*

17 *Washington*, 542 U.S. 296 (2004), and subsequent sentencing case law, because forfeiture

18 provisions have no statutory maximum. *See United States v. Messino*, 382 F.3d 704 (7th

19 Cir. 2004) (*Blakely* does not apply to criminal forfeiture); *see also United States v.*

20 *Shyrock*, 342 F.3d 938 (9th Cir. 2003) (*Apprendi* does not apply to criminal forfeiture).

21      Upon a party's request in a case in which a jury returns a guilty verdict for an

22 offense that gives rise to forfeiture, the jury must determine whether the government has

23 established the requisite nexus between the property and offense giving rise to forfeiture.

24 *See* Fed. R. Crim. P. 32.2(b)(4). Absent an explicit waiver by the defendant, the jury's

25 nexus determination should be made in a separate phase from the guilt/innocence phase to

26 avoid any confusion over the different burdens of proof. *See* Advisory Committee Notes

27 to 2000 Adoption of Federal Criminal Rule 32.2(b); *see also United States v. Garcia-*

28 *Guizar*, 160 F.3d 511 (9th Cir. 1998).

1    The requisite nexus and the amount of any money judgment must be determined by

2 reference to the applicable statute authorizing forfeiture for the offense of conviction.  In

3 this case, the government alleges that 18 U.S.C. § 981(a)(1)(C) authorizes the forfeiture

4 of any property, real or personal, which constitutes or is derived from proceeds traceable

5 to a violation of a "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7).

6 Embezzlement of government funds, in violation of 18 U.S.C. § 666(a)(1)(A), is a

7 specified unlawful activity under section 1956(c)(7)(D).  As applicable here, "proceeds"

8 is defined in section 981(a)(2)(A), which provides, in pertinent part:

9       In cases involving . . . unlawful activities . . . the term 'proceeds' means
        property of any kind obtained directly or indirectly, as the result of the
10      commission of the offense giving rise to forfeiture, and any property
        traceable thereto, and is not limited to the net gain or profit realized from
11      the offense.

12 Forfeiture under section 981(a)(1)(C) is made applicable to criminal cases pursuant to 28

13 U.S.C. § 2461(c), which states, in pertinent part, that:

14      If a person is charged in a criminal case with a violation of an Act of
        Congress for which the civil or criminal forfeiture of property is authorized,
15      the Government may include notice of the forfeiture in the indictment . . .
        pursuant to the Federal Rules of Criminal Procedure.  If the defendant is
16      convicted of the offense giving rise to the forfeiture, the court shall order
        forfeiture of the property as part of the sentence in the criminal case.

17

18 In determining whether the government has established the requisite nexus between the

19 property sought for forfeiture and the offense of conviction, the trier of fact can rely on

20 any evidence already in the record, or any evidence or information, including hearsay,

21 presented by the parties at a hearing after the verdict or finding of guilt.  *See* Rule

22 32.2(b)(1); *see also United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir. 2007) (Rule

23 32.2(b)(1) allows court to consider "evidence or information," thus making it clear that

24 court may consider hearsay).

25    Once the trier of fact has found that the government has established the requisite

26 nexus between the offense of conviction and the property sought for forfeiture, the court

27 must promptly enter a preliminary order of forfeiture without regard to third parties'

28 interest, if any, as that will be resolved in the ancillary proceeding.  *See* Rule 32.2(b)(2);

1   *see also United States v. Lazarenko*, 476 F.3d 642, 648 (9th Cir. 2007) (upon finding that

2   property involved was subject to forfeiture, court must promptly enter preliminary order

3   of forfeiture without regard to third party interest); *United States v. Nava*, 404 F.3d 1119,

4   1132 (9th Cir. 2005) (district court properly instructed jury that questions of ownership

5   "were not before them").

6          Finally, forfeiture is mandatory upon conviction of the offense giving rise to the

7   forfeiture. *See* 18 U.S.C. § 3554.

8                                    **III.  CONCLUSION**

9          For the reasons set forth above, the government respectfully requests that its

10  motions in limine be granted in their entirety.

11

12  DATED:  June 24, 2008                        Respectfully submitted,

13

14                                               JOSEPH P. RUSSONIELLO
                                                 United States Attorney

15

16          _____/s/_____
                                                 ERIKA R. FRICK

17                                               JONATHAN D. SCHMIDT
                                                 Assistant United States Attorneys

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES' MOTIONS IN LIMINE
CR 07-0380 SI                         23