1  JOSEPH P. RUSSONIELLO (CABN 44332)
   United States Attorney
2
   BRIAN J. STRETCH (CABN 163973)
3  Chief, Criminal Division

4  ERIKA R. FRICK (CABN 208150)
   JONATHAN D. SCHMIDT (CABN 230646)
5  Assistant United States Attorneys

6     450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102
7     Telephone: (415) 436-6973
      Facsimile: (415) 436-7234
8     E-Mail: erika.frick@usdoj.gov

9  Attorneys for the United States of America

10                      UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12                        SAN FRANCISCO DIVISION

13

14
   UNITED STATES OF AMERICA,          )    No. CR 07-380 SI
15                                     )
          Plaintiff,                   )    UNITED STATES' MOTION TO
16                                     )    CLARIFY ORDER DENYING
       v.                              )    DEFENDANT'S MOTION TO DISMISS
17                                     )    THE SECOND SUPERSEDING
   NINA L. DONEHUE,                    )    INDICTMENT
18                                     )
          Defendant.                   )    Date:  September 22, 2008
19  _____  )    Time:  11:00 a.m.

20

21                             **INTRODUCTION**

22        The United States respectfully moves this Court to clarify its Order Denying Defendant's

23  Motion to Dismiss the Second Superseding Indictment, which was issued on April 28, 2008.

24  Trial in this matter is set for October 27, 2008.  At the status hearing on July 25, 2008, the

25  government asked the Court to schedule early briefing and argument on this issue, so the parties

26  can know well in advance of trial how to craft jury instructions and complete other trial

27  preparation.  Granting the parties' request, the Court set a briefing and argument schedule for the

28  instant motion.  This Court has scheduled argument on this motion for September 22, 2008, at

    UNITED STATES' MOT. TO CLARIFY
    CR 07-0380 SI

1    11:00 a.m.

2                              **FACTUAL BACKGROUND**

3           **The Indictment and Offense Conduct**

4           The defendant, Nina L. Donehue, was charged by a federal grand jury on March 27, 2008,

5    in a Second Superseding Indictment, with one count of violating 18 U.S.C. § 666(a)(1)(A) by

6    embezzling funds from a federally-funded government agency, i.e., Northridge Cooperative

7    Homes, Inc. (hereinafter "Northridge").  The charge is based on Donehue's taking and retention

8    of Northridge operating account funds for her personal benefit.

9           Since 2003, Donehue has been a resident of Northridge, which is a housing cooperative

10   for low-income people that is funded by the U.S. Department of Housing & Urban Development

11   ("HUD") and that is located in the Bayview area of San Francisco.  In or about 2004, Donehue

12   was elected to the Northridge Board of Directors and held a position of Secretary.  At the

13   monthly Board meetings that Donehue attended from 2004 through January 2006, a Monthly

14   Report for Establishing Net Income was circulated to the Board members.  The monthly reports

15   included detailed financial information about Northridge's operating accounts.  Among other

16   things, the monthly reports revealed that Northridge had an operating account at Wells Fargo and

17   indicated the full account number (ending in 3488).

18          Because of her elected position, Donehue, like several other management and Board

19   members, was entrusted with signatory authority over the Northridge's operating account at the

20   Wells Fargo Bank.  As Donehue well knew, the Northridge had an established procedure for

21   paying bills that required each check written from the Northridge account to be supported by

22   receipts or other documentation and signed by three different authorized officials.  None of the

23   Northridge officers or Board members was authorized to have or did have a credit card or debit

24   card from the Northridge bank account, and none of the officers or Board members was

25   authorized to spend Northridge funds for personal use.

26          On or about December 19, 2005, Donehue opened an individual checking account with

27   the Wells Fargo Bank, Bayview Office, in San Francisco.  The Wells Fargo employee who

28   assisted Donehue was Sylvia Choy.  Choy authorized the issuance of two sets of bank cards for

UNITED STATES' MOT. TO CLARIFY
CR 07-0380 SI                                    2

1  Donehue during that transaction:  one from Donehue's individual account and one from a

2  Northridge business operating account.

3       On January 20, 2006, Donehue apparently checked to see how much money was in the

4  Northridge account, because there is a charge on the Northridge banking statement of $1.00 for

5  an "ATM Statement Fee."  The balance in the account on that date was approximately $76,000.

6  Thereafter, from January 20 to February 6, 2006, Donehue proceeded to incur a series of

7  unauthorized ATM cash withdrawals and debits on the Northridge account.  Donehue made a

8  total of 17 ATM withdrawals during the 17-day period between January 20 and February 6, 2006:

9  one each day on January 20, 21, 22, 23, and 24, 2006, two on January 25, 2006, one each day on

10 January 26, 27, 28, 30, and 31, 2006, and one each day on February 2, 3, 4, 5, and 6, 2006.  Most

11 of those ATM withdrawals were for $200 or $300 at a time.  At the time Donehue received the

12 funds, the ATM machines would almost certainly have informed her of the source of the funds (a

13 checking account rather than a line of credit), the account number (Northridge's account

14 number), and the balance in the account (which ranged from approximately $13,000 to nearly

15 $320,000 during this time period).  For example, Donehue incurred another "ATM Statement

16 Fee" for a withdrawal on February 4, 2006, and the balance showing in the account on that date

17 was approximately $320,000.  Donehue also made a total of approximately six purchases at

18 various merchants from January 24, 2006 (Red Lobster) through February 3, 2006 (Western

19 Christian).

20       During this time period, Donehue also obtained two cashiers checks from the Northridge

21 account, one for $20,000 on or about January 25, 2006, and one for $10,000 on or about January

22 27, 2006, and she used those cashiers checks to purchase a new 2006 Chrysler 300M automobile

23 from Barber Dealer Group ("Barber") in Vallejo, California.  In the course of purchasing that

24 automobile at Barber, Donehue filled out and signed a Credit Application.  On that application,

25 Donehue indicated that her total monthly income was $2523 (which amounts to approximately

26 $30,000 annually).  She also indicated that she had *two* bank accounts at Wells Fargo: one with a

27 balance of $100 (listed with the account number of her personal Wells Fargo account) and a

28 second *checking* account with a balance of $53,858 (listed with the last four digits of the Wells

UNITED STATES' MOT. TO CLARIFY

1    Fargo Northridge operating account, *i.e.*, 3488).

2    The total amount of unauthorized purchases by Donehue during the 17-day period from

3    January 20 to February 6, 2006 was approximately $35,000.

4    On or about February 6, 2006, Northridge discovered through a review of its bank

5    statements that the unauthorized purchases had occurred.  Northridge Administrator Dwenda

6    ("Penny") Hall went to Wells Fargo Bank and inquired about the disbursements.  Hall learned

7    that Donehue had received a bank card and that she was misappropriating Northridge funds.

8    After immediately canceling Donehue's access to the Northridge account, Northridge (through

9    Hall) filed a police report with the San Francisco Police Department.

10   On or about February 8, 2006, at a special called emergency Board meeting, the Board

11   members confronted Donehue about the transactions.  Donehue claimed that the bank had given

12   her "credit" and that she thought she would pay it back.  She indicated that she thought the bank

13   had issued the card to her personally and that she was not aware that the funds were actually

14   coming from Northridge's account.  After the meeting, several participants from the Board

15   meeting went to Donehue's residence to request that she return the automobile to Northridge.

16   Donehue did not return the car at that time.  As of the date of this filing, Donehue has not

17   returned the car or any of the other property to Northridge and continues to use the automobile

18   for her personal benefit.

19   The morning after the special called Board meeting, on February 9, 2006, Donehue

20   returned to Wells Fargo and told Sylvia Choy that she and the other signers on the Northridge

21   account were all partners at the cooperative and that Donehue thought she could use the money.

22   Donehue also stated that she went out and bought a new car with the money.

23   On or about October 16, 2006, Donehue was interviewed by HUD Special Agent James

24   Luu.  Donehue told Luu that the whole incident involving her misuse of Northridge's fund was

25   due to a mistake by Wells Fargo employees.  Donehue stated that instead of getting a credit card

26   that she thought she had applied for, she was given a business check card to the Northridge

27   account.  Donehue stated that she unknowingly used this Platinum business check card to make

28   purchases, thinking that it was a credit card.  Donehue admitted to Agent Luu that the maximum

UNITED STATES' MOT. TO CLARIFY
CR 07-0380 SI                                          4

1  credit limit she had on any credit card in the past was $500, and that her annual income was less

2  than $20,000.

3       **Donehue's Actions Pending Trial**

4       Although the government repeatedly requested that Donehue return the Chrysler 300M to

5  Northridge, Donehue did not do so.  When attempts to negotiate a voluntary return of the car fell

6  through and when in June 2008 the trial was continued again, to October 27, 2008, the

7  government decided to revisit the issue of seizing the car to preserve its value for forfeiture and

8  restitution.  The government did not want Donehue to drive the car for another four months

9  pending resolution of the trial not to mention additional time for sentencing and restitution

10  proceedings.  On June 26, 2008, government counsel sent defense counsel an email stating "With

11  this continuance, I'm going to revisit the issue of forfeiting the car because we are really troubled

12  that she has kept it so long and now it's going to be another four months. ...  So I just wanted to

13  make one more plea for her to return the car voluntarily."

14       On July 25, 2008, the parties appeared before this Court to set a motions schedule.  At

15  that time, the government notified the Court and defense counsel of its intention possibly to file

16  papers seeking seizure of the Chrysler 300M.  This Court indicated that the government should

17  bring its forfeiture papers to the magistrate court.

18       In the course of determining whether to file this seizure warrant, the government

19  conducted further investigation into Ms. Donehue's ownership of the Chrysler 300M automobile.

20  On July 28, 2008, the FBI learned from the DMV that Donehue transferred her car on June 30,

21  2008, just four days after government counsel's email to Mr. Hairston indicating that the

22  government planned to revisit the issue of seizing the car.  Further investigation by the FBI

23  revealed, moreover, that this was a "sham" transfer.  In fact, Ms. Donehue transferred title in the

24  car to her daughters, Janina Sheri Stiger and Tiffanique Shanina Stiger, listing Ms. Donehue's

25  address, 132 Harbor Road, as the new address for the reconveyance.

26                              **ARGUMENT**

27       In its Order Denying Defendant's Motion to Dismiss the Second Superseding Indictment,

28  this Court held that Section 666 is not a continuing offense for statute of limitations purposes,

UNITED STATES' MOT. TO CLARIFY
CR 07-0380 SI                    5

1   and the government does not take issue with that ruling here.  This Court further "agree[d] with

2   the government that if it cannot demonstrate that defendant violated § 666 when she received the

3   funds, it may be able to demonstrate that defendant violated § 666 when she decided to retain the

4   funds after learning that they were not hers and that Northridge wanted them back."  Order, at 4.

5   This Court went on to state:

6           The Court therefore construes the second superseding indictment as
            alleging that defendant committed a crime under § 666 between January

7           20, 2006 and February 6, 2006, under its first theory, or that defendant
            committed a crime under § 666 on or about February 8, 2006, when

8           defendant was notified that the funds belonged to Northridge.  In order to
            convict defendant, a jury must agree unanimously on which facts and

9           which of the government's two theories apply.  Such unanimity will avoid
            the duplicity problems raised by the defendant.

10

11  Order, at 4-5.

12          The government regrets that it was not more pellucid at the hearing on that motion and

13  respectfully seeks clarification of the Court's ruling in light of the further factual background

14  provided in this filing.  Specifically, the government believes it will be misleading to the jury to

15  divide the offense into two separate dates ranges as the Court has suggested.  In order to convict

16  the defendant, the jury must find – in essence – that Donehue took and/or retained funds

17  belonging to Northridge, and that at some point during the time when she took and retained those

18  funds, she formed a criminal intent.  Donehue's *actus reus*, that is, her taking and retention of

19  funds, was continuous from January 20, 2006 when she began withdrawing funds from the

20  operating account until February 8, 2006 and shortly thereafter, when she kept the Chrysler 300M

21  automobile despite being unequivocally informed at the Board meeting that the funds with which

22  she purchased it did not belong to her.  It is for the jury to decide if and when Donehue formed

23  the *mens rea* to defraud Northridge.  The jury may well find that Donehue had criminal intent

24  from the very beginning, when Choy opened the Northridge bank card for Donehue.  Or the jury

25  could conclude that Donehue figured out that the funds did not belong to her at any of various

26  points along the way, *e.g.*, (1) when Donehue repeatedly over the course of several weeks went to

27  the ATM machine and saw a checking account balance as high as $320,000; (2) on or about

28  January 25, 26, or 27, when Donehue signed cashiers check withdrawal slips indicating that the

UNITED STATES' MOT. TO CLARIFY
CR 07-0380 SI                                    6

1   funds were coming from a checking account rather than a credit card or line of credit; (3) when

2   she filled out and signed the Barber Dealer Group Credit Application on or about January 26,

3   2006 indicating that her assets included a second "checking account" with a balance of over

4   $50,000; or (4) when she was confronted by the Board on February 8, 2006 and thereafter refused

5   to return the car to Northridge.  The *actus reus* continued as long as Donehue was taking or

6   retaining funds, so it is for the jury to decide exactly when the *mens rea* was formed and a crime

7   was therefore committed.

8          Moreover, the jury could and should convict the defendant even if different jurors reach

9   different conclusions about when, precisely, Donehue had the requisite criminal intent.  Under

10  clearly established Ninth Circuit and Supreme Court precedent, there is no unanimity

11  requirement in this regard.  Under Federal Rule of Criminal Procedure 7(c)(1), "a jury may

12  convict on a finding of any of the elements of a disjunctively defined offense, despite the grand

13  jury's choice of conjunctive language in the indictment."  *United States v. Bettencourt*, 614 F.2d

14  214, 219 (9th Cir. 1980).  The Supreme Court has held that jurors are not constitutionally required

15  to unanimously agree on alternative theories of criminal liability.  *Schad v. Arizona*, 501 U.S.

16  624, 629 (1991) (no unanimity requirement for alternative theories of premeditated and felony

17  murder).  Rather, "'***different jurors may be persuaded by different pieces of evidence, even***

18  ***when they agree upon the bottom line.***  Plainly there is no requirement that the jury reach

19  agreement on the preliminary factual issues which underlie the verdict.'" *Id.* (emphasis added)

20  (quoting *McCoy v. North Carolina*, 494 U.S. 433, 449 (1990) (Blackmun, J., concurring)).  The

21  Ninth Circuit, too, has flatly rejected the idea that jurors must be unanimous about how the crime

22  was committed, even in cases where the acts that were alleged in the conjunctive would require a

23  finding of substantially different fact patterns by the jury in order to convict.  *See, e.g.*, *United*

24  *States v. Abascal*, 564 F.2d 821, 832 (9th Cir. 1977) (holding, in the context of an indictment

25  alleging that defendants conspired to "import, distribute, and possess with intent to distribute"

26  drugs, that "[t]he government may charge in the conjunctive form that which the statutes

27  denounce disjunctively, and evidence supporting any one of the charges will support a guilty

28  verdict").  Indeed, the Ninth Circuit has specifically held there was no duplicity problem in a case

UNITED STATES' MOT. TO CLARIFY
CR 07-0380 SI                                          7

1   involving a conjunctive indictment under Section 641, which is an analog to Section 666. *See*

2   *McGriff v. United States*, 408 F.2d 333, 334 (9th Cir. 1969) (indictment charging that defendant

3   did "receive, conceal and retain" stolen goods and property in violation of 18 U.S.C. § 641 was

4   not duplicitous because "'[i]t is ... proper to charge conjunctively the elements of a crime which

5   is denounced disjunctively in the statute, and a finding of any one of the said elements will

6   support a verdict of guilt.'").[1]

7       Those cases are exactly on point here. "It is important to distinguish ... a statute creating

8   several offenses from one ... which enumerates several ways of committing the same offense."

9   *Gerberding v. United States*, 471 F.2d 55, 59 (8th Cir. 1973) (rejecting duplicity challenge where

10  indictment alleged that defendant assaulted *and* put in jeopardy the lives of two persons).

11  Section 666(a)(1)(A) enumerates five different ways – embezzle, steal, obtain by fraud, convert,

12  or intentionally misapply – of committing the same offense. Far from being mutually exclusive,

13  those five ways of committing the crime overlap in significant ways. For example,

14  embezzlement includes the "'the deliberate taking *or* retaining'" of another's property. *United*

15  *States v. Smith*, 373 F.3d 561, 564 (4th Cir. 2004). Similarly, conversion also includes "the

16  deliberate taking *or* retaining of the money or property of another." Eighth Circuit Model

17  Criminal Jury Instructions, Final Instructions: Elements of Offenses, § 6.18.666A, page 190.

18  Because the five verbs in Section 666 all fundamentally define a single offense that can be

19  committed in several ways, unanimity is not required. Thus, for example, even if six jurors

20  believed she had criminal intent from the first meeting with Choy (and, for example, concluded

21  that she "embezzled" the assets) and six jurors believed she did not have criminal intent until the

22  February 8, 2006 Board meeting (and concluded she "converted" the assets), Donehue should

23  still be convicted under the clearly established precedents cited above. The jury should convict if

24  the defendant did in fact take and/or retain at least $5000 of Northridge's property and knew,

25  either at the time of the taking of the property or at the time of her decision to retain that property

26

27      [1] *United States v. Aguilar*, 756 F.2d 1418 (9th Cir. 1985), is inapposite because, unlike
    with 18 U.S.C. § 666 (or, by analogy, 18 U.S.C. § 641), the fact that 18 U.S.C. § 912 "states two
28  offenses is well established." 756 F.2d at 1420 n.1.

UNITED STATES' MOT. TO CLARIFY
CR 07-0380 SI                          8

1  or both, that the property belonged to Northridge.  That is why the indictment should not be

2  limited to a particular date or theory.

3      The government respectfully submits that bifurcating the date range or, in the

4  alternative, superseding the indictment to allege two counts, will only mislead the jury and create

5  problems and possibly even a miscarriage of justice.  It is true as the Court held that Donehue can

6  be convicted whether she had the requisite criminal intent when she took the property or after she

7  already had the property in her possession.  However, the applicability of those two "theories"

8  cannot be neatly divided into two date ranges or two separate counts.  For example, if –

9  hypothetically – the jury decided that proof beyond a reasonable doubt of criminal intent were

10  established by Donehue's statements on the Barber Credit Application on January 26, 2006,

11  Donehue had already taken a large amount of property, and she thereafter retained that property

12  while continuing to take more property with criminal intent.  Thus, the "retention" theory cannot

13  be limited to "on or about February 8, 2006."  Nor does expanding the date range of the

14  "retention" theory fully solve the conundrum here.  If the jury is instructed that it must

15  unanimously choose between property being unlawfully "taken" from January 20 to February 6,

16  2008 versus unlawfully "retained" from January 20 to February 8, 2008 or shortly thereafter, six

17  jurors might choose one theory and six the other, resulting in a hung jury despite the fact that the

18  defendant clearly committed the offense.  Conversely, if the indictment were superseded to

19  charge two counts with those dates ranges, other problems arise.  Because the verbs in Section

20  666 are not mutually exclusive, there is no logical way to divide up the verbs into two counts.

21  And even if all five verbs are included in each count, with an instruction that

22  one count covers "taking" and one count covers "retaining," the jury could easily convict

23  Donehue of both counts, thus resulting in a multiplicity problem, or could disagree about which

24  had been proved, thus resulting again in a hung jury.

25      Rather than bifurcating the date range, superseding the indictment, or even giving a

26  unanimity instruction, the most appropriate way to address this issue is simply to give a standard

27  jury instruction as the Court would in any case involving an indictment that contains multiple

28  verbs defining the offense.  For example, in bank robbery cases, where the crime can be

UNITED STATES' MOT. TO CLARIFY
CR 07-0380 SI                    9

1   committed by force, violence, or intimidation, courts routinely give a standard jury instruction

2   without requiring unanimity about whether the crime was committed by force, violence, or

3   intimidation.  The same course should be followed here.

4          The government emphasizes that its position in no way contradicts this Court's ruling that

5   Section 666 does not create a continuing offense.  The crime here was not completed until

6   Donehue formed the requisite *mens rea*.  Prior to her realization that the funds did not belong to

7   her, the *actus reus* may have already been established, but it was not yet a crime.  Once it became

8   a crime, the government submits that the entire course of conduct from January 20 through

9   February 8, 2006 or shortly thereafter constituted one crime of taking and/or retaining property

10  with criminal intent, and that it does not matter if part of the conduct was taking with criminal

11  intent and part of the conduct was retaining with criminal intent (depending on which date the

12  intent was formed).  This is exactly the sort of case that the precedents cited above from the

13  Ninth Circuit and the Supreme Court (*Bettencourt*, *Schad*, and *McGriff*) were meant to address.

14  It is for the jury to decide if a crime was committed here, and the jury should convict even if the

15  individual jurors disagree on exactly when the criminal intent was formed.

16                                      **CONCLUSION**

17         For the reasons described above, the United States respectfully asks this Court to give a

18  standard jury instruction as the Court would in any case involving an indictment that contains

19  multiple verbs defining the offense.

20

21  DATED: August 22, 2008              Respectfully submitted,

22                                      JOSEPH P. RUSSONIELLO
                                        United States Attorney
23

24                                      _____/s/_____
                                        ERIKA R. FRICK
25                                      Assistant United States Attorney

26

27

28

UNITED STATES' MOT. TO CLARIFY
CR 07-0380 SI                           10